Kent A. Yalowitz
Tanya E. Kalivas
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Phone (212) 715-1000
Fax (212) 715-1399

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                               :

  WORLD OF BOXING LLC, ALEXANDER     :     Civil Action No. _____
  POVETKIN, and ANDREY RYABINSKIY,   :

              Plaintiffs,         :     **COMPLAINT AND DEMAND**
                           :     **FOR JURY TRIAL**
         - against -         :
                           :

  DEONTAY WILDER, DIBELLA          :
  ENTERTAINMENT, INC. and LOU DIBELLA, :
                           :
            Defendants.      :
                           :
                           :
------------------------------------------------------------- x

       Plaintiffs World of Boxing LLC ("World of Boxing"), Alexander Povetkin ("Povetkin"),

and Andrey Ryabinskiy ("Ryabinskiy") (collectively, "Plaintiffs"), by and through their

undersigned counsel, hereby file this Complaint against Deontay Wilder ("Wilder"), DiBella

Entertainment ("DBE"), and Lou DiBella ("DiBella") (collectively, "Defendants"), alleging as

follows:

<u>NATURE OF CASE</u>

      1.     Defendant Deontay Wilder is a world heavyweight boxing champion.  He and his

promoter promised that Wilder would defend his championship on May 21, 2016, in Moscow,

Russia, against a formidable challenger—Alexander Povetkin.  On May 13, it was announced

that Povetkin had tested positive for a trace amount of Meldonium, a commonly used over-the-

counter medication that was placed on the banned substances list of the World Anti-Doping

Agency on January 1, 2016.  This positive test for a trace amount was absolutely not a smoking

gun:  trace amounts of Meldonium have recently been found in the urine of dozens of innocent

athletes, because (as recently announced by the World Anti-Doping Association) it can take

many months for the body to excrete Meldonium.

2.      "In the case of meldonium," the World Anti-Doping Agency has explained,

"***there is currently a lack of clear scientific information on excretion times***."  Accordingly, the

World Anti-Doping agency has set up studies and has listed one-microgram per milliliter as the

amount at which a finder of fact could "justifiably find (unless there is scientific evidence to the

contrary) that an athlete who [ingested Meldonium before January 1, 2016] could not reasonably

have known or suspected that the meldonium would be still present in his or her body on or

after" January 1.  Povetkin tested far, far below the 1-microgram cutoff.  His result was 0.07

micrograms per milliliter.

3.      The heavyweight championship bout was governed by the rules of the World

Boxing Council—the WBC.  The WBC Rules specify that "the WBC does not employ or adhere

to a 'strict liability' standard in anti-doping matters.  In each case, the WBC may in its discretion

consider all factors in making a determination regarding responsibility, relative fault, and

penalties, if any."

4.      Thus, a week before the bout, Defendants knew the following information:

WADA had recently put Meldonium on its banned list; WADA had then reversed course and

said that levels below one microgram did not require athletes to stop competing; Povetkin had

tested positive for a miniscule amount of Meldonium—0.07 micrograms; and WBC's rules

required the WBC to "consider all factors" before taking adverse action on a drug test.

5.      But Defendants did not wait for the WBC to "consider all factors."  Instead, they

immediately walked away from their obligations, falsely announcing that the bout had been "canceled," and began a public smear campaign against Plaintiffs.

6.      Defendants' refusal to secure Wilder's participation in the Fight constitutes an unjustified breach of their express contractual obligations and constitutes repudiation of contract. As a direct result of Defendants' breaches of contract, Plaintiffs have incurred millions of dollars in damages.  Defendants' unfettered smear campaign has caused additional damages to Plaintiffs, in an amount to be determined at trial but no less than $10 million each.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Complete diversity of citizenship exists between Plaintiffs (all citizens of the Russian Federation) and Defendants.  Defendant Wilder is a citizen of Alabama, and Defendants DiBella and DBE are citizens of New York.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

8.      This Court has personal jurisdiction over Defendants Wilder and DBE pursuant to the parties' written agreements, by which Defendants agreed to "irrevocably accept and consent to the jurisdiction of the United States District Court for the Southern District of New York to resolve any dispute arising out of [the Bout] Agreement" and consented "to the exclusive jurisdiction of the United States District Court for the Southern District of New York to resolve any dispute arising out of [the Escrow] Agreement or related to the Bout."  This Court has personal jurisdiction over DiBella because, on information and belief, he is a citizen of New York.

9.      Venue is proper in this District because, in the parties' written agreements, Defendants agreed that "any dispute arising out of [the Bout] Agreement" or "arising out of [the

3

Escrow] Agreement or related to the Bout" shall be subject to the exclusive jurisdiction of the United States District Court, Southern District of New York.

## THE PARTIES

10.     Plaintiff  Alexander Povetkin is professional boxer and a citizen of Russia.  He is a party to the Bout Agreement.

11.     Plaintiff World of Boxing LLC ("World of Boxing") is a Limited Liability Company organized under the laws of the Russian Federation, having its principal place of business in Moscow, Russia.  World of Boxing is in the business of promotion and event planning for boxing matches and is a party to the Bout Agreement and the Escrow Agreement.

12.     Plaintiff Andrei Ryabinskiy is a citizen of Russia.  Ryabinskiy is the President of World of Boxing.

13.     Upon information and belief, Defendant Deontay Wilder is an individual who is a citizen of the State of Alabama.  Wilder is a party to the Bout Agreement and the Escrow Agreement.

14.     Upon information and belief, Defendant DBE is a corporation organized under the laws of the State of New York, having its principal place of business in Sea Cliff, New York. DBE is a party to the Bout Agreement and the Escrow Agreement.

15.     Upon information and belief, Defendant Lou Dibella is president of DBE and is a citizen of New York.

## FACTUAL BACKGROUND

16.     Wilder is the current WBC World Heavyweight Champion.  (The WBC is one of four governing boxing federations that sanction boxing events.)  Known as the "Bronze Bomber," Wilder has a professional record of 36 wins and 0 losses.  As part of the WBC's Rules, the champion is required to defend his title against a "mandatory challenger" once a year.

4

17.     Povetkin is the WBC's designated "mandatory challenger."  Povetkin is 36 years old and has a lifetime record of 30 wins and 1 loss.

18.     On or about January 20, 2016, the WBC ordered Wilder and Povetkin to enter negotiations for Wilder's mandatory title defense.  When the two sides did not reach an agreement, the WBC hosted what is known as a "purse bid," in which any promoter registered with the WBC can submit a sealed bid for the right to promote a bout.

19.     The purse bid hearing was held at the Grand Hyatt Miami in Miami, Florida on February 26, 2016.  World of Boxing submitted a winning bid amount of $7.15 million, which gave World of Boxing the right to host the WBC championship in Moscow, Russia and own the promotion and intellectual property rights for the event.  The only other bidder present at the purse bid hearing was Wilder's promotor, DBE, who submitted a losing bid of approximately $5.1 million.

20.     The Bout Agreement provided that if the fight took place, Wilder would receive $4,504,500 from the purse, Povetkin would receive $1,930,500, and the winner of the fight would receive $715,000.  All payments from the purse would be subject to a 3 percent sanction fee payable to WBC.  Section 4.

21.     Wilder did not want to defend his title on away turf in Moscow, Russia, particularly against a challenger as strong as Povetkin.  Before the purse bid auction, Boxing Scene reported that "[b]oth sides admit the biggest hurdle to overcome is not the money, but the location of the contest.  Wilder and his team want the fight in the United States.  Povetkin and his promoter want the contest in Russia."  Because Wilder's promoter lost the purse bid, Wilder did not have the right to defend his title in the United States.

**The Agreements**

      **A.**      **The Bout Agreement**

22.      After World of Boxing won the purse bid, the WBC ordered the parties to enter negotiations regarding the Bout.  As directed by the WBC, Plaintiffs began good faith negotiations with Defendants to stage the Bout between Wilder and Povetkin.

23.      By early April, however, the parties had not yet finalized an agreement for the Bout.  As a result, on April 6, 2016, the WBC intervened and informed the parties that it would draft an agreement for the parties.  On or about April 11, 2016, Plaintiffs and Defendants entered into the Bout Agreement.  In that Agreement:

      (a)      The parties agreed that the Bout "shall be conducted in compliance with and governed by the Constitution and Rules & Regulations of the WBC, all of which are incorporated hereby and made a part of this Agreement."  Section 3.

      (b)      The parties agreed that the "WBC shall exclusively perform any and all decisions, results, and actions relating to the Bout."  Section 3.

      (c)      The parties agreed that the WBC "has the exclusive right not to certify the Bout as a WBC Heavyweight Championship if it determines that the WBC Rules & Regulations are not being respected."  Section 3.

      (d)      Wilder represented and warranted that he "agrees to cooperate and assist Promoter in the publicizing, advertising, and promoting of the Bout, and agrees that he will arrive at the site of the Bout at least seven (7) days prior to the scheduled date of the Bout."  Section 11.

      (e)      Wilder and Povetkin agreed to submit to the WBC Clean Boxing Program ("CBP") for anti-doping testing in and out of competition, to be performed by the Voluntary Anti-Doping Association ("VADA").  Section 7.

24. VADA is a relative newcomer on the anti-doping testing scene.  It was created in 2011 to focus on the sport of boxing, unlike the World Anti-Doping Association ("WADA"), which has greater jurisdictional reach.  Unlike WADA, VADA does not certify its own labs and, on information and belief, follows the decisions made by WADA regarding the legality of certain substances.  VADA's Official Prohibited List provides that "VADA guidelines concerning the[] specific substances and groups [on the Prohibited List] are intended to closely track internationally recognized standards for substances prohibited by sport, such as the World Anti-Doping Agency (WADA) Official Prohibited List of 2016.  Therefore, nomenclature for these substances, classification groups and other uses by the WADA Prohibited List will be preserved, unless otherwise specified by VADA."

25. VADA's website states that "VADA has arranged for a WADA approved laboratory to conduct the tests."  VADA's rules do not specify which lab must conduct the anti-doping testing.   On information and belief, VADA typically relies on the WADA-approved UCLA Anti-Doping Center for drug testing, which is headed by Anthony Butch and is one of only two WADA-accredited doping laboratories in the United States.  The Bout Agreement does not specify a laboratory for anti-doping testing.

**B.    The Escrow Agreement**

26. On or about April 19, 2016, defendant Wilder, defendant DBE, World of Boxing, and the non-party Chicago Trust Company (the "Escrow Agent" or "Chicago Trust") entered into the Escrow Agreement.

27. The Escrow Agreement provided that World of Boxing would deposit $4,369,365.00  (the "Escrow Property") into the Escrow Account.  Thereafter, in accordance with the terms of the Bout Agreement and Escrow Agreement, World of Boxing deposited the Escrow Property into the Escrow Account maintained by Chicago Trust Company.

7

28.     The Escrow Agreement also provided that, if the Event failed to take place as scheduled, World of Boxing would send the Escrow Agent an affidavit to that effect and, upon receipt of that affidavit, the Escrow Agent would disburse the "entire Escrow Property" to World of Boxing.  Escrow Agreement, Section 1.3(c).  The parties' obligations under section 1.3(c) of the Escrow Agreement are not dependent upon the reason the match is postponed or canceled.  In other words, the Agreements are structured so that Wilder (and Povetkin) are paid only if the Bout takes place.  This makes sense—neither fighter has any financial incentive per the Agreements to avoid the Bout.

29.     The Escrow Agreement further provided that, if after submitting a disbursement request, either Party objects to such disbursement of the Deposit in writing, then the Escrow Agent will not disburse the funds until it receives joint instruction from the parties or a court order.  Escrow Agreement, Section 1.3(d).

30.     The Escrow Agreement included a liquidated damages clause, which was constructed to compensate a party entitled to the Escrow Property if the opposing party submits an objection to the disbursement of the funds that is not in good faith:

(a)     "The parties agree and acknowledge that the submission of an objection in writing to the Escrow Agent which is not made in good faith would cause harm to the party entitled to the disbursement and because actual damages would be difficult to quantify, the party who has filed such objection agrees to pay liquidated damages to the party entitled to the disbursement in the amount USD $2.5 million . . . ."  Escrow Agreement, Section 1.3(d).

31.     The Bout did not take place as scheduled, so World of Boxing is entitled to the Escrow Property.  However, in an effort to block World of Boxing from recovering the Escrow Property to which it is contractually entitled, Wilder and DBE sent a letter to Chicago Trust,

8

without justification, that "[w]hile we recognize that [World of Boxing] has not yet made a formal disbursement request to CTC for the return of the Escrow Property, we are writing to advise you . . . that Mr. Wilder objects to CTC's disbursement of any of the Escrow Property . . . ."

32.     Faced with Wilder's objection letter, Chicago Trust advised in an email dated May 16, 2016, that Chicago Trust had received Wilder's objection and would not be disbursing "any of the funds" until they received joint instruction or a court order.

33.     Wilder and DBE have thus locked the $4,369,365.00 million due World of Boxing until a court issues an order releasing the funds.  DBE and Wilder's request to the Escrow Agent was not made in good faith, and thus subjects Wilder and DBE to the liquidated damages clause of the Escrow Agreement.

34.     As of the date of this Complaint, Defendants have not taken any steps to remedy the damage caused to Plaintiffs by their actions.

35.     As of the date of this Complaint, Defendants still assert that they are entitled to the Escrow Property held in escrow at Chicago Trust.

**Meldonium**

36.     Meldonium was invented in Latvia and approved in the 1980s for therapeutic use in patients with ischemic heart disease.  It is now readily available over the counter in Eastern European countries.  It works by inhibiting the biosynthesis of Carnitine, a naturally occurring substance in the body that transports fatty acids to the mitochondria in cardiomyocytes (muscle cells of the heart) and other cells.  In other words, Meldonium is an inhibitor of fatty acid oxidation in the heart and other organs as well.  By blocking fatty acid oxidation, Meldonium forces the muscles to use glucose for energy instead of fatty acids.  When cells use glucose, they require less oxygen.  This biochemical change in the heart alleviates the chest pain associated

with ischemic heart disease by making it easier for patients to obtain energy even if they have inadequate oxygen delivery due to heart disease.

37.     For Meldonium to have a therapeutic effect on the patient, it must be taken in a sufficient dose for an extended period of time—typically at least 10 days.  Meldonium has no documented effect on healthy individuals or in "micro" doses.

38.     In September 2015, WADA announced that Meldonium would be added to the banned substances list as of January 1, 2016.  WADA did not conduct or identify even a single published study concluding that Meldonium enhances the performance of athletes.

39.     Further, WADA did not conduct studies regarding the excretion rates of Meldonium from the body before it announced its ban of the drug.   Therefore, WADA did not have an evidentiary basis to determine when athletes who had been taking the drug stopped taking the drug upon commencement of the ban.

40.     On information and belief, WADA's ban on Meldonium was in part premised on its usage among athletes from Russia and other Eastern European nations, and not on any evidence that Meldonium actually enhances the athletic performance of persons taking the drug. By contrast, many American and European athletes are known to take L-carnitine, which is widely available as a supplement in the United States.  Increased levels of L-carnitine allow the body to use energy in fatty acids more quickly.  Published studies indicate that the use of L-carnitine by healthy athletes increases exercise endurance and slows heart rate.

41.     WADA has not taken action to ban the use of L-carnitine.

42.     Since January 1, 2016, hundreds of athletes have tested positive for Meldonium. However, this is a separate issue from the doping scandal involving Russian track and field athletes who competed in the Sochi Olympics, which did not involve Meldonium.  Indeed,

Meldonium was not a banned substance at that time.  Moreover, and unlike in this case, those athletes' samples were allegedly tampered with to avoid detection of any banned substances.

43.    On April 11, 2016, WADA took the unprecedented step of reversing course on its policy regarding Meldonium when it issued a notice concerning Meldonium (the "Notice"). Meldonium was previously categorized as a "substance prohibited at all times" without a quantitative threshold, which means that any positive test for the substance, regardless of volume, was considered a violation.  The Notice acknowledged that the excretion rates for Meldonium are not well understood and are subject to further study by WADA.   The Notice states:

    (a)    Limited data exists to date on the urinary excretion of meldonium.  Several studies are currently being conducted involving WADA-accredited laboratories, and WADA will share these results with stakeholders when available.

    (b)    The renal elimination of meldonium is expected to vary significantly between individuals, depending on the dosing and duration of the drug administration protocol.

    (c)    Preliminary results obtained from single and multiple drug applications indicate that the urinary elimination of meldonium at recommended doses includes an initial rapid excretion phase (estimated half-life 5-15 h), which is followed by a second, longer elimination phase with an estimated half-life of more than 100 H.

    (d)    Based on the preliminary results of the aforementioned studies, this translates to urinary concentrations higher than 10 µg/mL up to 72 h (first elimination phase) followed by a persistent long-term excretion (second elimination phase) . . . . Long term urinary excretion below 1 µg/mL down to several hundred ng/mL can persist for a number or weeks and in the low tens of ng/mL for a few months.

44.     The Notice includes a section titled "Results Management and [A]djudication."  It admits that "the mere presence of meldonium in an athlete's sample" triggers the results management process.  However, it carves out an exception for Meldonium:

(a)     "In the case of meldonium, *__there is currently a lack of clear scientific information on excretion times__*.  For this reason, a hearing panel might justifiably find (unless there is scientific evidence to the contrary) that an athlete who [ingested meldonium before January 1, 2016] could not reasonably have known or suspected that the meldonium would still be present in his or her body on or after" January 1, 2016.

(b)     "In these circumstances, WADA considers that there may be grounds for no fault or negligence on the part of the athlete."

(c)     As a result, "[r]esults management may be stayed" "[i]f the concentration is below 1 µg/mL and the test was taken after 1 March *given that the results of ongoing excretion studies are needed to determine the time of the ingestion*."

45.     VADA circulated the Notice to Plaintiffs and Defendants on May 13, 2016.

**The Science of Meldonium**

46.     WADA's admission that the excretion pattern and therefore the timing of ingestion of this drug is not understood confirms what the limited scientific literature says about the substance.

47.     The published literature on Meldonium reports that excretion of Meldonium is non-linear and continues for an extended period of time at very low levels.  One of the only studies of Meldonium excretion was led by a researcher from the Institute of Biochemistry, Center for Preventative Doping Research of the German Sport University Cologne (the "Tretzel Study").  The Tretzel Study was conducted with the oral administration of Meldonium to two

healthy volunteers as either a single dose or as a multi-dose over a period of six consecutive days.  In addition to blood-sampling, post-administration urine specimens were conducted over a period of up to 49 days.  The study found that Meldonium followed a non-linear, atypical elimination behavior.

48.     The Tretzel Study includes three charts which show the post-administration concentration of Meldonium in DBS (dried blood spotting) (Fig. 1), in urine after a single application (Fig. 2), and in urine after multi-dose administration over six days (Fig. 3).

Fig. 1



Fig. 2



Fig. 3



49.    After the initial excretion period, "Meldonium was detected at concentrations between ca.1 and 9 µg/mL until day 33, corroborating the aforementioned slow excretion process of the drug."

50.    Notably, the chart in Figure 2 above shows zero concentration of Meldonium at some points and then further positive readings—just as in Povetkin's situation.

51.    The study concluded that this atypical elimination behavior of Meldonium "suggested an incorporation of the substance into the cellular fraction of blood," which was further investigated and confirmed by study of the blood samples.

52.    Literature data reports an estimated half-life of Meldonium during the initial rapid elimination phase of 5 to 15 hours.  However, the results of the Tretzel pilot study "suggest the existence of a ***subsequent second and substantially slower elimination phase***, attributed to a proposed incorporation of meldonium into erythrocytes."

53.    The Tretzel Study, and others, confirm what WADA also recognized in April 2016:  that "limited data exists to date on the urinary excretion of meldonium;" that "the renal elimination of meldonium is expected to vary significantly between individuals, depending on the dosing and duration of the drug administration protocol;" and "preliminary results . . . indicate that the urinary elimination of meldonium at recommended doses includes an initial rapid excretion phase . . . which is followed by a second, longer elimination phase."  Long term urinary excretion can persist for weeks or months.

54.    Trace amounts of Meldonium—whether through residual excretion or alleged "micro" doses—in no way can affect fatty acid metabolism in the heart muscle or any other organ.  Meldonium needs to be present in significantly higher concentrations in the liver in order to cause the inhibition of Carnitine biosynthesis.  These trace amounts of Meldonium in the urine

do not reflect its pharmacological activity, and have no impact whatsoever on an athlete's performance.

**VADA Testing**

55.     By early April 2016, both fighters had submitted the necessary doping control forms to VADA.  Povetkin was tested on April 7, 2016 and his sample tested negative for any substances.  Povetkin was tested on April 8, 2016 and his sample tested negative for any substances.  Povetkin was tested again on April 11, 2016 and his sample tested negative for any substances.

56.     The Povetkin "A" Sample taken from the athlete on April 27, 2016 tested positive for 70 nanograms/ml of Meldonium.  This is 0.07 micrograms—a very small fraction of the 1 microgram that WADA used as a cutoff for justifiably finding that the athlete "could not reasonably have known or suspected that the meldonium would still be present in his or her body on or after" January 1, 2016.

57.     The positive results were disclosed to Povetkin and the Defendants on May 13, 2016.  The Povetkin "B" Sample, taken from the athlete on April 27, 2016, was opened and tested on May 26, 2016 and tested positive for 72 nanograms/ml of Meldonium (still approximately 0.07 micrograms and still a fraction of the 1 microgram cutoff).

58.     A week before the scheduled fight, on May 17, 2016, Povetkin again tested negative for any amount of Meldonium (or any other banned substance).

59.     Alexander Povetkin used Meldonium in 2015, when it was not a banned substance.  Povetkin has not consumed Meldonium on or after January 1, 2016, since the substance was placed on WADA's banned substance list.

60.     The WBC Rules specify that "the WBC does not employ or adhere to a 'strict liability' standard in anti-doping matters.  In each case, the WBC may in its discretion consider

all factors in making a determination regarding responsibility, relative fault, and penalties, if any."   Section 4.40 of the Rules & Regulations of the World Boxing Council.

**The Bout**

61.     On May 13, 2016, the parties were notified that a trace amount of Meldonium was detected in Povetkin's sample.  After the disclosure of the test results, the WBC announced that it was investigating the matter.  The WBC made no mention that the Bout was postponed or canceled.  Both parties had agreed that the WBC had the final decision regarding any matters regarding the Bout, per Section 3 of the Bout Agreement—and the WBC rules contemplate consideration of *all* factors in making a determination regarding responsibility, relative fault, and penalties, if any.

62.     The Bout Agreement required that Wilder report to Moscow, Russia, seven days before the Bout, or by May 16, 2016.  Wilder was scheduled to depart from England for Moscow on Sunday, May 15, 2016.  As of Sunday, May 15, 2016, the WBC still had not made any announcement regarding the Bout.  Nevertheless, Wilder did not board his flight to Russia and instead immediately returned to the United States.  As a result, a few hours later, the WBC was forced to announce that the Bout had been postponed.

63.     Wilder's return to the United States before the WBC had made any decision regarding the Bout constituted a repudiation of his obligations under the Bout Agreement—the equivalent of a childish temper tantrum.  On information and belief, Wilder and DBE never wanted a title defense in Russia, and they used the inconclusive Meldonium test as a pretext to walk away.

**Defendants' Smear Campaign Against Povetkin**

64.     To cover up their own misconduct, Defendants immediately began spreading lies about the Bout in the press, to tarnish and defame the reputation of Povetkin and Ryabinskiy.

65.     They falsely stated that the fight was canceled rather than postponed.  They also made statements to journalists asserting not only that Povetkin cheated by taking Meldonium after January 1, 2016, but that he did it to gain an improper advantage in his fight against Wilder, and that Povetkin, Ryabinskiy, and World of Boxing lied after the fact in order to cover it up. These statements were false and were made with reckless disregard for the truth.

66.     Specifically, DBE, through its principal Lou DiBella, made the following false statements regarding Povetkin's test results:

(a)     "The information you have obtained [from Dr. Margaret Goodman] . . . yecontradicts the public statements made by Mr. Ryabinskiy attempting to excuse Povetkin's positive result.  If there was a trace amount from 2015 in his system, it would have shown up in the other three tests in April that preceded the positive result."  Dan Rafael, *Two reports assert Alexander Povetkin took meldonium after ban*, ESPN.com (May 15, 2016), available at http://espn.go.com/boxing/story/_/id/15543234/alexander-povetkin-took-meldonium-was-banned-according-two-separate-reports.

(b)     "This is a very serious PED because it wasn't on the (World Anti-Doping Agency) banned list until Jan. 1.  This is the type of PED that results in extremely elevated stamina and a fighter performing like the Energizer bunny."  Dan Rafael, *Two reports assert Alexander Povetkin took meldonium after ban*, ESPN.com (May 15, 2016), available at http://espn.go.com/boxing/story/_/id/15543234/alexander-povetkin-took-meldonium-was-banned-according-two-separate-reports.

(c)     "As a result of Povetkin's use of a banned substance and breach of contract, Deontay Wilder was deprived of an opportunity to defend his title as he was

18

prepared to – on an even playing field." Zachary Alapi, *Deontay Wilder statement about Povetkin's positive test*, the Living Daylights (May 16, 2016), available at https://thelivingdaylights.co/2016/05/16/deontay-wilder-statement-about-povetkins-positive-test/.

67. In addition, Wilder made the following statements regarding Povetkin's test results:

(a) "This was a coward's way out.  I have no respect for athletes who cheat their way to the top.  I don't even see how you can live with yourself, knowing that you had to cheat to get what you got.  How can you look yourself in the mirror?"  William C. Rhoden, *Even Deontay Wilder, an Untainted Boxer, Loses Out in a Doping Scandal*, NYTimes.com (May 16, 2016), available at http://www.nytimes.com/2016/05/17/sports/even-deontay-wilder-an-untainted-boxer-loses-out-in-a-doping-scandal.html.

(b) "He was coming to fight me with a knife in his hands.  I was going to fight him with my hands."  William C. Rhoden, *Even Deontay Wilder, an Untainted Boxer, Loses Out in a Doping Scandal*, NYTimes.com (May 16, 2016), available at http://www.nytimes.com/2016/05/17/sports/even-deontay-wilder-an-untainted-boxer-loses-out-in-a-doping-scandal.html.

(c) "This is already a put your life on the line type of sport.  This was like someone coming to a fight with a knife in their hands."  Tim Dahlberg, *Wilder on Povetkin doping: Like coming to fight with a knife*, AP.com (May 17, 2016), available at http://bigstory.ap.org/article/4719b5e9a189402ea21dfd3a4df1cb04/wilder-povetkin-doping-coming-fight-knife.

(d)     "I'm very disgusted.  If they had apologized and manned up, then I believe in

second chances.  It's the fight business and people get nervous and I understand

trying to do something spectacular for your country and he went to the depths of

cheating.  But they didn't man up (and apologize).  As far as I'm concerned, there

is no future for Deontay Wilder and Alexander Povetkin.  He already [chose] his

fate and he chose the cowardly way."  Wil Esco, *Deontay Wilder frustrated by*

*WBC, claims thousands of boxers are doping*, BadLeftHook.com (May 24, 2016),

available at http://www.badlefthook.com/2016/5/24/11759548/deontay-wilder-

frustrated-by-wbc-claims-thousands-of-boxers-are-doping.

(e)     "I think this is definitely not his first time.  Even when they banned it, (three) of

his tests came back negative and that last test came back positive.  Needless to say

he was taking it small doses at a time trying to sneak it in.  It's not right.  What's

the crazy part about it that they don't want to admit it, they don't want to man up

to the truth.  They're still trying to cover it up and make excuses about it.  That's

not cool."  *Wilder: This is Not Povetkin's First Time, Man Up and Admit Use!*,

BoxingScene.com (May 17, 2016), available at

http://www.boxingscene.com/wilder-this-not-povetkins-first-time-man-up-admit-

use--104679.

(f)     "I have a lot of friends that are in this sport.  I have a lot of friends that know

about the human body.  One of the things when you take certain substances is the

shape of the head.  You start seeing the shape of the head change.  From how his

head was before to how it is now, it's shaped differently.  That made us assume

that he had to be juicing or something."  *Wilder: This is Not Povetkin's First*

*Time, Man Up and Admit Use!*, BoxingScene.com (May 17, 2016), available at

20

http://www.boxingscene.com/wilder-this-not-povetkins-first-time-man-up-admit-use--104679.

(g)   "It would be understandable if he tore something or broke something.  But when it comes to somebody taking something, whether by mouth or in his veins by syringe, that's unacceptable.  There should be no tolerance.  They were well aware of what they were doing."  Dan Rafael, *Wilder: Povetkin 'should be suspended'*, ESPN.com (May 25, 2016), available at http://espn.go.com/blog/dan-rafael/post/_/id/16072/wilder-povetkin-should-be-suspended.

(h)   "I definitely think he should be suspended.  This will set the tone for the future of boxing.  There are probably a lot of users on the edge of their seat right now.  They could be next.  We gonna see what the [WBC] decision is.  I support the WBC movement to have a clean program.  But just because Povetkin got caught, a lot of guys haven't got caught.  Boxing is already dangerous without taking anything."  Dan Rafael, *Wilder: Povetkin 'should be suspended'*, ESPN.com (May 25, 2016), available at http://espn.go.com/blog/dan-rafael/post/_/id/16072/wilder-povetkin-should-be-suspended.

(i)   "But because of his decision to use a banned substance, the fight didn't happen."  Dan Rafael, *Deontay Wilder to make title defense against Chris Arreola*, ESPN.com (June 14, 2016), available at http://espn.go.com/boxing/story/_/id/16191529/deontay-wilder-make-heavyweight-defense-chris-arreola.

(j)   "Why would he feel like, in this situation, that he would get a pass?  Just certain things that we've got the evidence to prove it.  Some guys like to fight on even playing grounds and some guys like to cheat."  Drew Champlin, *After being on*

21

*'verge of depression', Deontay Wilder ready for next heavyweight title fight in Birmingham*, AL.com (June 15, 2016), available at http://www.al.com/sports/index.ssf/2016/06/after_being_on_verge_of_depres.html.

68.     Each of the Defendants' foregoing statements were false.  Povetkin did not cheat. Povetkin did not lie.  Povetkin did not bring a knife to a fist-fight.  Povetkin has not ingested Meldonium since before its addition to WADA's banned substances list on January 1, 2016.  The trace amounts detected in his April 27, 2016 substance do not support the false assertion that Povetkin did so, particularly in light of published articles showing the very long and non-linear excretion of Meldonium and WADA's publicly acknowledged need for studies to determine when a person with a trace amount actually ingested the Meldonium.

69.     Contrary to Defendants' false statements, Povetkin, Ryabinskiy, and World of Boxing told the truth when they said that Povetkin did not take Meldonium after the ban was imposed.

70.     On information and belief, Defendants made these statements for the purpose of avoiding their contractual obligation to defend Wilder's title in Moscow, and without any good reason to believe that their statements were true.  Particularly in light of Povetkin's repeated denials of having taken Meldonium after January 1, 2016 and WADA's acknowledged inability of ascertaining when Povetkin (or any other athlete) ingested Meldonium, Defendants knew or should have known that their accusations against Povetkin, Ryabinskiy, and WOC were likely false, and yet Defendants recklessly made their statements without regard for whether those statements were true or false.

71.     The accusations Defendants made against Povetkin, Ryabinskiy, and World of Boxing are defamatory and have injured their reputations.  Defendants have falsely accused

Povetkin of ingesting banned substances in order to gain an unfair advantage over an opponent—both with respect to the Bout, and in earlier matches as well—and have claimed Povetkin's attempts at cheating would have jeopardized Wilder's safety during the Bout.  Further, Defendants have accused Povetkin, Ryabinskiy, and World of Boxing of lying to VADA and to the public in an attempt to cover up Povetkin's claimed drug use.  These allegations of illicit drug use, cheating, lying, and endangering the safety of others have caused Povetkin, Ryabinskiy, and WOB severe reputational harm.

## COUNT I
### (BREACH OF CONTRACT)

72.     The allegations set forth in the foregoing paragraphs are adopted and incorporated by reference as if fully set forth herein.

73.     Plaintiffs and Defendants entered into the Bout Agreement, a valid and binding written contract that set forth the terms and conditions governing the promotion and staging of the Bout between Wilder and Povetkin.

74.     In the Bout Agreement, Wilder and DBE specifically agreed to cause Wilder to participate in the Bout, and arrive in Moscow seven days before the Bout to promote the fight.

75.     Plaintiffs have complied with all of their obligations under the Bout Agreement.

76.     Plaintiffs, at considerable expense, made all necessary arrangements for the Bout to take place.

77.     In the Bout Agreement, the parties expressly agreed that the WBC rules would govern the Bout.  WBC Rules grant the WBC discretion to "consider all factors in making a determination regarding responsibility, relative fault, and penalties, if any" and do not impose a "strict liability" regime for the alleged use of banned substances.  WBC Rules also reserve to the WBC the right to make decisions concerning the scheduling of the bout.

78.     Before WBC had any chance to exercise any discretion or make any decisions, Defendants repudiated their contractual obligations by turning around and going home.

79.     As a result, the WBC was forced to announce that the Bout was postponed.

80.     Wilder and DBE have repudiated and breached the Bout Agreement.

81.     Plaintiffs have been damaged as a result of those breaches and are entitled to damages in an amount to be determined at trial but totaling millions of dollars.

## COUNT II
## (BREACH OF CONTRACT - ESCROW AGREEMENT)

82.     The allegations set forth in the foregoing paragraphs are adopted and incorporated by reference as if fully set forth herein.

83.     World of Boxing, defendants Wilder and DBE and non-party Chicago Trust entered into the Escrow Agreement, a valid and binding written agreement that set forth the terms and conditions governing the $4,369,365.00 Deposit.

84.     In the Escrow Agreement, the parties agreed that Chicago Trust would release the entire Escrow Property to World of Boxing upon receipt of an affidavit stating that the Bout had failed to take place as scheduled.

85.     World of Boxing has complied with all of its obligations under the Escrow Agreement, including by depositing the $4,369,365.00 into the Escrow Account.

86.     Defendants Wilder and DBE have taken actions to prevent Chicago Trust from releasing such funds to World of Boxing, including through a letter directing Chicago Trust to refrain from disbursing the Escrow Property to World of Boxing.

87.     Wilder and DBE have breached the Escrow Agreement.  Because the letter to Chicago Trust was not sent in good faith, Wilder has triggered the liquidated damages provision of the Escrow Agreement.

88.     World of Boxing has been damaged as a result of those breaches and is entitled to liquidated damages in the amount of $2.5 million.

## COUNT III
### (DEFAMATION)

89.     The allegations set forth in the foregoing paragraphs are adopted and incorporated by reference as if fully set forth herein.

90.     Following the WBC's May 13, 2016 announcement that trace amounts of Meldonium had been found in Povetkin's April 27, 2016 sample, Defendants falsely asserted that the Bout was canceled and made a barrage of defamatory statements to journalists and to the public regarding Povetkin, World of Boxing, and Ryabinskiy.  Specifically, Defendants accused Povetkin (1) of ingesting Meldonium after the substance was banned by WADA on January 1, 2016; (2) of ingesting Meldonium to gain an unfair advantage over Wilder during the Bout and previously in Povetkin's career; and (3) of placing Wilder's health and safety at risk by ingesting a banned substance.  In addition, Defendants accused Povetkin, World of Boxing, and Ryabinskiy of lying to VADA and the public in an effort to cover up what Defendants claimed was Povetkin's illicit attempt at cheating.

91.     Wilder and DBE's statements about Povetkin, World of Boxing, and Ryabinskiy were all false.  Specifically, Povetkin did not ingest Meldonium after January 1, 2016, and certainly did not do so to gain an unfair advantage over Wilder during the Bout and with disregard for Wilder's health and safety.  Further, neither Povetkin, World of Boxing, nor Ryabinskiy have lied to the public or anyone else regarding Povetkin's ingestion of Meldonium.

92.     Wilder and DBE made their false statements recklessly and without regard for whether or not their statements were true or false.  Wilder and DBE knew, or should have known, that their statements about Povetkin, World of Boxing, and Ryabinskiy were likely false,

and yet they made those statements anyway in an attempt to avoid their own contractual obligations for Wilder to defend his title in Moscow.

93.     Wilder and DBE's statements regarding Povetkin, World of Boxing, and Ryabinskiy were defamatory and constitute defamation per se.  Wilder and DBE have accused Povetkin, a professional athlete, of attempting to cheat at his profession, of intentionally disobeying the rules of his sport, and of disregarding the health and safety of a competitor. Wilder and DBE have accused Povetkin, World of Boxing, and Ryabinskiy of lying in order to cover up Povetkin's cheating.  These allegations have severely harmed Povetkin, World of Boxing, and Ryabinskiy's reputations.

94.     Plaintiffs have been injured in amounts to be proven at trial, but not less than $10,000,000 each.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby demand the following relief against Defendants:

(a)     Damages in an amount to be proved, but not less than $34,500,000.00

(b)     Other consequential damages;

(c)     Attorneys' fees and costs;

(d)     Prejudgment and post-judgment interest; and

(e)     Any other relief that this Court may deem just and proper.

**A JURY TRIAL IS HEREBY DEMANDED**.

Dated: New York, New York              ARNOLD & PORTER LLP
       June 23, 2016

                                   By:    **/s/ Kent A. Yalowitz**
                                          Kent A. Yalowitz
                                          kent.yalowitz@aporter.com
                                          Tanya E. Kalivas
                                          tanya.kalivas@aporter.com

399 Park Avenue
New York, New York 10022
Tel:  (212) 715-1000
Fax:  (212) 715-1399

*Attorneys for Plaintiffs*