UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WORLD OF BOXING LLC, ALEXANDER
POVETKIN and ANDREY
RYABINSKIY,

               *Plaintiffs*,

      -- against --

DEONTAY WILDER, DIBELLA
ENTERTAINMENT, INC. and
LOU DIBELLA,

               *Defendants*.
-------------------------------------------------------------X

Civil Action: 16-cv-04870


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS DEONTAY WILDER,
DIBELLA ENTERTAINMENT, INC. AND LOU DIBELLA'S MOTION TO DISMISS
THE COMPLAINT**


JUDD BURSTEIN, P.C.
5 Columbus Circle, Suite 1501
New York, NY 10019
Tel.: (212) 974-2400
Fax: (212) 974-2944
*Attorneys for Defendants Deontay
Wilder, DiBella Entertainment, Inc.
and Lou DiBella*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

POINT I

THE COURT SHOULD CONVERT THIS MOTION INTO A MOTION FOR
SUMMARY JUDGMENT AND DISMISS THE ACTION II COMPLAINT'S
FIRST AND SECOND CLAIMS FOR RELIEF WITH PREJUDICE . . . . . . . . . . . . . . . . . . . . 5

POINT II

ACTION II PLAINTIFFS' DEFAMATION CLAIM SHOULD BE DISMISSED
PURSUANT TO RULE 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.     THE GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

           1.     TRUTH IS AN ABSOLUTE, UNQUALIFIED
                   DEFENSE TO A DEFAMATION CLAIM . . . . . . . . . . . . . . . . . . . . . . . 10

           2.     MERE OPINION OR RHETORICAL HYPERBOLE
                   IS NOT ACTIONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           3.     TO STATE A CLAIM FOR DEFAMATION, A PUBLIC FIGURE
                   OR LIMITED PURPOSE PUBLIC FIGURE MUST PLEAD
                   FACTS SHOWING THAT THE STATEMENTS WERE
                   MADE WITH "ACTUAL MALICE" . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.     APPLICATION OF THE LAW TO THE COMPLAINT'S
           ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           1.     DIBELLA'S ALLEGED STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . 14

i

POINT III

THE ACTION II PLAINTIFFS' CLAIMS SHOULD BE DISMISSED
BECAUSE THEY MUST BE BROUGHT, IF AT ALL, AS
COMPULSORY COUNTERCLAIMS IN ACTION I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

CASES

*Abkco Music, Inc. v. William Sagan, Norton LLC,*
    2016 WL 2642224 (S.D.N.Y. May 6, 2016) ................................... 13

*Adelson v. Harris,*
    774 F.3d 803 (2d Cir. 2014) ............................................... 10

*Albert v. Loksen,*
    239 F.3d 256 (2d Cir. 2001) ............................................... 12

*Appletree v. City of Hartford,*
    555 F. Supp. 224 (D. Conn. 1983) .......................................... 21

*Armstrong v. Simon & Schuster,*
    85 N.Y.2d 373 (1995) .................................................... 10

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................... 12

*Avemco Ins. Co. v. Cessna Aircraft Co.,*
    11 F.3d 998 (10th Cir. 1993) .............................................. 22

*Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.,*
    478 F.2d 191 (2d Cir. 1973) ............................................... 22

*Biro v. Conde Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012) ...................................... 10

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013),
    *aff'd*, 622 F. App'x 67 (2d Cir. 2015) .................................. 12, 14

*Biro v. Conde Nast,*
    807 F.3d 541 (2d Cir. 2015) ............................................... 12

*Bonadio v. East Park Res., Inc.,*
    220 F.R.D. 187 (N.D.N.Y. 2003) ...................................... 20, 21

*Brahms v. Carver,*
    33 F. Supp. 3d 192 (E.D.N.Y. 2014) ................................... 10, 17

*Celle v. Filipino Reporter Enterprises Inc.*,
  209 F.3d 163, 176 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*,
  233 F.3d 697 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Fortson v. Colangelo*,
  434 F. Supp. 2d 1369 (S.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gross v. New York Times Co.*,
  82 N.Y.2d 146 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Guccione v. Hustler Magazine, Inc.*,
  800 F.2d 298 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Johnson v. Verizon*,
  2009 WL 3000080 (S.D.N.Y. Sept. 23, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kerik v. Tacopina*,
  64 F. Supp. 3d 542 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Lerman v. Flynt Distrib. Co.*,
  745 F.2d 123 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McNamee v. Clemens*,
  762 F. Supp. 2d 584 (E.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Medcalf v. Walsh*,
  938 F. Supp. 2d 478 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am.
Home Products Corp.*,
  850 F.2d 904 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Neilson Co. (U.S.), LLC v. Success Systems, Inc.*,
  112 F. Supp. 3d 83 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

iv

*Pochiro v. Prudential Ins. Co. of Am.*,
    827 F.2d 1246 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Schatz v. Republican State Leadership Committee*,
    669 F.3d 50 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Silsdorf v. Levine*,
    59 N.Y.2d 8 (N.Y.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Sira v. Morton*,
    380 F.3d 57 (2d Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Southern Const. Co. v. Pickard*,
    371 U.S. 57 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

## STATUTES AND OTHER AUTHORITY

Fed.R.Civ.P. 9(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R.Civ.P. 12(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R.Civ.P. 13(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed.R.Civ.P. 13(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

**INTRODUCTION**

Defendants Deontay Wilder ("Wilder"), DiBella Entertainment, Inc. ("DBE"), and Lou DiBella ("DiBella") respectfully submit this Memorandum of Law in support of their motion, pursuant to Fed.R.Civ.P. 12(b)(6), 12(d) and 13(a)(1)(A), to dismiss the Complaint in this case.

**STATEMENT OF THE FACTS**

On June 13, 2016, Wilder and DBE ("Action I Plaintiffs") commenced an action styled *Deontay Wilder and DiBella Entertainment, Inc. v. World of Boxing, LLC and Alexander Povetkin*, Civil Action No. 16-cv-04423 (S.D.N.Y.) ("Action I"). The Complaint in Action I (the "Action I Complaint") is attached as Exhibit A to the accompanying Declaration of Judd Burstein ("Burstein Dec.").

In essence, the Action I Complaint alleges that World of Boxing, LLC ("WOB") and Alexander Povetkin ("Povetkin") (collectively "Action I Defendants") breached a Bout Agreement (the "WBC Agreement") for Wilder and Povetkin to fight on May 21, 2016 for the World Boxing Council ("WBC") World Heavyweight Championship (the "Bout"). The WBC Agreement (Exhibit A to Exhibit A to Burstein Dec. at 1) required WOB to "make available the services" of Povetkin on May 21, 2016 for the Bout, and for Povetkin to fight in the Bout. However, on April 27, 2016, prior to the Bout, Povetkin tested positive for the use of a banned substance, Meldonium. (Exhibit A to Burstein Dec., at ¶ 48). On May 15, 2016, as a result of Povetkin's positive test for Meldonium, the WBC issued a ruling that the Bout could not go forward as scheduled. (*Id.*, at ¶ 51)

In addition, as alleged in the Action I Complaint:

On or about April 19, 2016, DBE, Wilder, WOB, and a non-party Escrow Agent (the "Escrow Agent") entered into an escrow agreement (the "Escrow Agreement")[] dated April 19, 2016. The Escrow Agreement provided that WOB

would deliver $4,369,365.00 to the Escrow Agent (the "Deposit") at least 21 calendar days before the Bout.

In accordance with the terms of the WBC Agreement and the Escrow Agreement, WOB delivered the Deposit to the Escrow Agent.

The Escrow Agreement contains a liquidated [damages] provision.

* * *

On May 15, 2016, [John] Wirt [Wilder's attorney] sent the Escrow Agent a letter informing it of Povetkin's positive drug test and that the Bout would not take place on the date of May 21, 2016 as contractually required. Wirt further requested that the Escrow Agent not disburse any of the Deposit until it received a joint instruction from the parties or a non-appealable order from a court of competent jurisdiction.

On June 1, 2016, [Kent] Yalowitz [WOB's attorney] sent Wirt a letter making clear WOB's refusal to consent to release of the Deposit to Plaintiffs, instead threatening to sue Wilder for $2.5 million in liquidated damages if Wilder did not immediately agree to allow the Escrow Agent to return the Deposit to WOB.

As of the date of this Complaint, WQB continues to assert that it is entitled to return of the Deposit

(*Id.*, at ¶¶ 42-44; 53-55) (internal footnote omitted)

On June 23, 2016, instead of filing what are surely compulsory counterclaims under Fed.R.Civ.P. 13(a)(1), WOB, Povetkin, and Andrey Ryabinskiy, the President of WOB, ("Ryabinskiy") (collectively, with WOB and Povetkin, "Action II Plaintiffs") filed "Action II," a Complaint against Wilder, DBE, and DiBella (collectively, "Action II Defendants"). (Exhibit B to Burstein Dec.) While the Complaint in Action II (the "Action II Complaint") devotes many paragraphs to the significance of Meldonium as a prohibited substance and the amount of Meldonium found in Povetkin's system, those allegations are just a side show.

The heart of the Action II Complaint is found in the following section of that Complaint:

The Bout Agreement required that Wilder report to Moscow, Russia, seven days before the Bout, or by May 16, 2016. Wilder was scheduled to depart from England for Moscow on Sunday, May 15, 2016. As of Sunday, May 15, 2016,

the WBC still had not made any announcement regarding the Bout. Nevertheless, Wilder did not board his flight to Russia and instead immediately returned to the United States. As a result, a few hours later, the WBC was forced to announce that the Bout had been postponed.

Wilder's return to the United States before the WBC had made any decision regarding the Bout constituted a repudiation of his obligations under the Bout Agreement—the equivalent of a childish temper tantrum. On information and belief, Wilder and DBE never wanted a title defense in Russia, and they used the inconclusive Meldonium test as a pretext to walk away.

(Exhibit B to Burstein Dec., at ¶¶ 62-63)[1]

On the basis of this key allegation – that Wilder left for the United States before the WBC had taken any action, thereby forcing the WBC to postpone the fight – the first two claims for relief in Action II mirror the first two claims for relief in Action I.

Action II's First Claim for Relief seeks damages on the theory that Wilder and DBE agreed to make Wilder's services available for the Bout and that DBE and Wilder breached that obligation because the WBC cancelled the Bout due to Wilder having already returned to the United States before the WBC had reached a decision with respect to Povetkin's failed drug test.[2]

Thus, Action II's First Claim for Relief is essentially the converse of Action I's First Claim for Relief, which alleges that WOB and Povetkin agreed to make Povetkin's services

---

[1]   As we demonstrate *infra*, the Action II Plaintiffs' claim that Wilder returned to the United States is an outright falsehood. In fact, the WBC postponed the Bout on May 15, 2016, and Wilder did not make his reservation to return to the United States until after the WBC had ruled, and did not depart England, where he had been training, until the next day, May 16, 2016.

[2]   Logically, this contention makes no sense. If the Bout did not go forward because Wilder precipitously returned to the United States, the WBC would have said so, and would not have needed to state that Povetkin's failed drug test was the basis for its decision.

3

available for the Bout, and that WOB and Povetkin breached that obligation by reason of the WBC postponing the Bout due to Povetkin's use of Meldonium.[3]

Action I's and Action II's respective Second Causes of Action are also mirror images of each other, as they both allege that the other breached the Escrow Agreement because each refused to instruct the Escrow Agent to release monies based upon the other's breach of the WBC Agreement.

Finally, Actions I and II do have different Third Claims for Relief.  The Action I Complaint's Third Claim for Relief seeks a declaratory judgment as to whether Action I Plaintiffs or WOB are entitled to the release of the monies held pursuant to the Escrow Agreement.

In contrast, the Action II Complaint's Third Claim for Relief alleges that the Action II Defendants defamed the Action II Plaintiffs because they allegedly

> falsely stated that the fight was canceled rather than postponed.  They also made statements to journalists asserting not only that Povetkin cheated by taking Meldonium after January 1, 2016, but that he did it to gain an improper advantage in his fight against Wilder, and that Povetkin, Ryabinskiy, and World of Boxing lied after the fact in order to cover it up.

(Exhibit B to Burstein Dec., at ¶ 65)

## ARGUMENT

The simplest reason why this case should be dismissed is because, as shown in POINT III, *infra*, all of the Action II Plaintiffs' claims must, pursuant to Fed.R.Civ.P.13 (a)(1)(A), be brought as compulsory counterclaims in Action I.

---

[3]       As demonstrated by their mirroring First Causes of Action, the Parties are at least in agreement on one point: that if one of the fighters (be it Wilder or Povetkin) engaged in conduct which caused the Bout not to go forward, the fighter's promoter would also be liable for damages under the WBC Agreement.

However, permitting the Action II Plaintiffs to replead their claims as counterclaims in Action II would be a waste of judicial resources because, as demonstrated below, the Action II Plaintiffs' claims, whether brought as direct claims or counterclaims, must be dismissed on the merits with prejudice.

**POINT I**

**THE COURT SHOULD CONVERT THIS MOTION INTO A MOTION FOR SUMMARY JUDGMENT AND DISMISS THE ACTION II COMPLAINT'S FIRST AND SECOND CLAIMS FOR RELIEF WITH PREJUDICE**

We of course recognize that, on a Rule 12(b)(6) motion, a plaintiff's allegations must be assumed to be true. But it is also true that a defendant can seek to categorically disprove a plaintiff's allegations via Rule 12(d), which provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

As the Court made clear in *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am. Home Products Corp.*, 850 F.2d 904, 911 (2d Cir. 1988):

> To determine whether the district court properly converted a 12(b)(6) or 12(c) motion into a motion for summary judgment, "[t]he essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."

(Citation omitted); *see Sira v. Morton*, 380 F.3d 57, 68 (2d Cir.2004) ("A party is deemed to have notice that a motion may be converted ... if that party should reasonably have recognized the possibility that such a conversion would occur.") (Citation and internal quotation marks omitted).

Here, there could not possibly be a claim of undue surprise because the Action II Defendants are presenting evidence in their moving papers that are outside of the pleadings, and they are explicitly asking that such evidence be considered on this motion – thereby ensuring that the Action II Plaintiffs will not be surprised and will be provided "a reasonable opportunity to meet facts outside the pleadings." *Id.*

In addition, where a defendant seeks to convert a Rule 12(b)(6) motion into one for summary judgment based upon documentary evidence, "the court must be assured that there is no dispute regarding the 'authenticity or accuracy' or 'relevance' of the documents considered." *Johnson v. Verizon,* 2009 WL 3000080, at *4 (S.D.N.Y. Sept. 23, 2009) (Gorenstein, M.J) (citation omitted). Here, the "facts outside the pleadings" consists primarily of plainly authentic and relevant documents which indisputably contradict the gravamen of the Action II Plaintiffs' First and Second Claims for Relief – *i.e.*, that

> [a]s of Sunday, May 15, 2016, the WBC still had not made any announcement regarding the Bout. Nevertheless, Wilder did not board his flight to Russia and instead immediately returned to the United States. As a result, a few hours later, ¶the WBC was forced to announce that the Bout had been postponed.

(Exhibit B to Burstein Dec., at ¶ 62)

In the first instance, **the WBC itself has affirmatively rejected this allegation**. At a July 17, 2016 transcribed meeting between the WBC and representatives of Wilder and DBE in Birmingham, Alabama, the following colloquy between WBC President Mauricio Sulaiman and counsel for Wilder, DBE and DiBella occurred:

> MR. BURSTEIN: And if I could, just so that we have on the record, the underlying facts as confirmed by the WBC, so I know exactly that we have an agreement on the facts, which is that there were tests. Mr. Povetkin, pursuant to the Clean Boxing Program, unannounced tests … on … April 7th, April 8th, and April 11th, [2016] that all came back negative [for Meldonium].
>
> MR. SULAIMAN: Correct.

6

MR. BURSTEIN: **The next test was April 27th, and that came back positive [for Meldonium] … then after the April 27th test, the WBC made a decision on May 15th to, as a result of that positive test, not to go forward with the Povetkin/Wilder fight as scheduled.**

MR. SULAIMAN: **Correct.**

(Exhibit C to Burstein Dec. at 8-9) (Emphasis supplied)

**But Mr. Sulaiman's statement is not the only proof demonstrating that the Action II Complaint's key allegation is false:**

a.  The Declaration of Alex Dombroff, DBE's in-house counsel, ("Dombroff") ("Dombroff Dec.") demonstrates that (i) at 11:19 a.m. EDT on May 15, 2016, the WBC announced on its Twitter account that it was not permitting the Bout to go forward as scheduled on May 21, 2016 ("WBC Announcement") (*id.*, at ¶¶ 5-6); (ii)  at or around 11:35 a.m. EDT on that same day, the WBC then issued a "WILDER VS POVETKIN UPDATE" which stated that its ruling was based upon Povetkin's "positive test result from the [WBC's] Clean Boxing Program" (*id.*); and (iii) Wilder did not direct Dombroff to arrange for Wilder and his team to fly back to the United States until **after** the WBC had announced that the fight would not be going forward as scheduled.  (*Id.*, at ¶ 7)

b.  Wilder has submitted a Declaration ("Wilder Dec.") in which he states that he learned about Povetkin's failed drug test on May 13, 2016. (Wilder Dec., at ¶¶ 3-4)  Nonetheless, he remained in England (where he was training) because he did not know whether the WBC was going to permit the Bout to go forward.  (*Id.*, at ¶ 5)  Most importantly, Wilder states that he did not make plans to return home to the United States until **after** the WBC Announcement was issued, and in fact did

not travel home until the next day, May 16, 2016.  (*Id.*, at ¶¶ 6-8)  Wilder's claim about his travel dates is confirmed by Exhibit A to his Declaration – the Boarding Pass for his flight home to the United States.

    c.    The Declaration of Eduardo Rubenstein ("Rubenstein") ("Rubenstein Dec."), the travel agent who arranged for Wilder's flight back to the United States, corroborates Wilder's and Dombroff's sworn statements that no plans were made for Wilder to return to the United States until after the WBC Announcement. Rubenstein states, at approximately Noon EST on May 15, 2016 (*i.e..*, **after the WBC Announcement**) Dombroff informed him on a telephone call that the Bout was not going forward, and that Wilder needed to fly home to the United States. (Rubenstein Dec., at ¶ 3)   Thereafter, Rubenstein booked a reservation for Wilder to fly from Manchester, England to Birmingham, Alabama on May 16, 2016. Rubenstein's claim is corroborated by Exhibit A to his Declaration which, as Rubenstein explains, shows that he made the reservation for Wilder at 12:37 p.m. on May 15, 2016.  (*Id.*, at ¶¶ 4-5)

    d.    Most damningly, Exhibit A to the Declaration of Wilder's attorney, John Wirt ("Wirt"), ("Wirt Dec.") demonstrates that, **at the exact same time of the WBC announcement** (11:19 a.m. EDT),[4] **Ryabinskiy,** obviously having been told in advance that the Bout would not be going forward as scheduled, **issued a tweet**

---

[4]    Exhibit A to Wirt Dec. shows a time stamp of 10:19 a.m. on Ryabinskiy's tweet. As explained by Wirt, his Twitter account is set up so that the time stamp on a tweet reflects the time at the place where a tweet is received.  The time stamp on the tweet from Ryabinskiy was 10:19 a.m.  At the time, Wirt was in the State of Wisconsin, where the time is one hour behind EDT. (Wirt Dec., at ¶ 4)

**confirming that the Bout was not going forward as scheduled on May 21, 2016**.  (Wirt Dec., at ¶¶ 3-4)

Taken together, these indisputably authentic documents make it crystal clear that the Action II Complaint's key allegation – that "the WBC was forced to announce that the Bout had been postponed" because Wilder left for "the Unites States before the WBC had made any decision" (Exhibit B to Burstein Dec., at ¶¶ 62-63) – is completely false.  Hence, this is a case where converting the motion to one for summary judgment is appropriate, given that the Action II Plaintiffs should not be given the benefit of an assumption that their Complaint's allegations are true when they are so indisputably false.[5]

## POINT II

## ACTION II PLAINTIFFS' DEFAMATION CLAIM SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6)

### A.   THE GOVERNING LAW

"To establish a claim for defamation under New York law, a plaintiff must prove that: (1) the defendant published a defamatory statement of fact to a third party, (2) that the statement of fact was false, (3) the false statement was made with the applicable level of fault, and (4) either the false statement was defamatory per se or caused the plaintiff special harm."  *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013) (Engelmayer, D.J.).  "It is for the court to decide whether the statements complained of are 'reasonably susceptible of a defamatory connotation,' thus warranting submission of the issue to the trier of fact." *McNamee v. Clemens*,

---

[5]      In asking the Court to convert this motion into one for summary judgment, we recognize the general rule that, when a Court grants such a request, the plaintiff should be granted an opportunity for discovery.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).  But here, the factual issues – when the WBC Announcement was made and when Wilder left England – are simple, and the proof presented by movants on these issues is indisputable.  As such, there is no need for discovery.

762 F. Supp. 2d 584, 600 (E.D.N.Y. 2011) (quoting *Silsdorf v. Levine*, 59 N.Y.2d 8, 12–13, 462

N.Y.S.2d 822, 449 N.E.2d 716 (N.Y.1983)).  "The New York Court of Appeals has explained

that there is 'particular value' in resolving defamation claims at the pleading stage, 'so as not to

protract litigation through discovery and trial and thereby chill the exercise of constitutionally

protected freedoms.'"  *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting

*Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 379 (1995)).

### 1.    <u>Truth Is an Absolute, Unqualified Defense to a Defamation Claim</u>

Under New York law, it is "fundamental that truth is an absolute, unqualified defense to a

civil defamation action."  *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986)

(citation and internal quotation marks omitted).

### 2.    <u>Mere Opinion or Rhetorical Hyperbole Is Not Actionable</u>

> An expression of pure opinion is not actionable. It receives the Federal
> constitutional protection accorded to the expression of ideas, no matter how
> vituperative or unreasonable it may be…. A "pure opinion" is a statement of
> opinion which is accompanied by a recitation of the facts upon which it is based.
> An opinion not accompanied by such a factual recitation may, nevertheless, be
> "pure opinion" if it does not imply that it is based upon undisclosed facts….
> When, however, the statement of opinion implies that it is based upon facts which
> justify the opinion but are unknown to those reading or hearing it, it is a "mixed
> opinion" and is actionable….

*Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289-90 (1986) (citations omitted).

In addition to expressions of pure opinion, "rhetorical hyperbole" is also considered a

Constitutionally protected opinion.  *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014); *see*

*Brahms v. Carver*, 33 F. Supp. 3d  192, 199 (E.D.N.Y. 2014) ("The statement was also clearly

'rhetorical hyperbole' or a 'vigorous epithet,' … particularly when viewed in the context of the

heated argument—replete with name-calling—in which Marcano and Brahms had engaged only

weeks earlier.") (Citation omitted); *see also Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1380

(S.D. Fla. 2006) (holding that the in the context of professional basketball "no reasonable listener could conclude that Colangelo's invocation of the term 'thug' was anything but hyperbolic.").

Importantly, the question of "whether a given statement expresses fact or opinion ... is one of law for the court[.]" *Steinhilber*, 68 N.Y.2d at 290. Answering this question

> entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "'signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact'"….

*Gross v. New York Times Co.*, 82 N.Y.2d 146, 153 (1993).

### 3.   To State a Claim for Defamation, a Public Figure or Limited Purpose Public Figure Must Plead Facts Showing that the Statements Were Made with "Actual Malice"

As discussed below, "public figures" or "limited purpose public figures" who sue for defamation carry a heavier burden in order to prevail. "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures[.]" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Moreover, even if a defamation plaintiff is not a "public figure" for all purposes, a plaintiff who has: "(1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media" will be deemed a limited purpose public figure. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984). "Whether a plaintiff is a public figure is a question of law for the court." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). Moreover, "the Court may

11

deem a plaintiff a public figure at the motion to dismiss stage." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), *aff'd*, 622 F. App'x 67 (2d Cir. 2015).

Public figures or limited purpose public figures "must show that the [defamatory] statements were made with 'actual malice'—that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (citations omitted). "Reckless disregard" requires proof that the person who made the alleged defamatory statement "entertained serious [subjective] doubts as to the truth of his publication." *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 571 (S.D.N.Y. 2014) (citation omitted).

In the wake of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit has held that

> malice must be alleged plausibly in accordance with Rule 8…. ("[T]o make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred….")  In any event, we have long made clear that "[d]efamation actions are, for procedural purposes, ... to be treated no differently from other actions…."

*Biro*, 807 F.3d at 545 (citations omitted).  Put another way, "pleading 'actual-malice buzzwords' is simply not enough to nudge a case into discovery." *Biro* 963 F. Supp.2d at 279-80 (S.D.N.Y. 2013) (citing *Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 56 (1st Cir. 2012)).

## B.   <u>APPLICATION OF THE LAW TO THE COMPLAINT'S ALLEGATIONS</u>

The Action II Plaintiffs' defamation claim is not a model of clarity.  However, one thing is crystal clear: they have limited themselves to a claim of defamation *per se* -- *i.e.,* defamatory statements that "(i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman." *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001).  The Action II Complaint does not adequately allege any other type of defamation because allegations of defamatory statements that do not amount to defamation *per se* require proof of special damages.

12

*Abkco Music, Inc. v. William Sagan, Norton LLC*, 2016 WL 2642224, at *3 (S.D.N.Y. May 6, 2016).  Here, the Action II Plaintiffs cannot rely on a claim of special damages because they have failed, as required by Fed.R.Civ.P. 9(g), to plead special damages with particularity.

Turning now to the hodgepodge of 13 statements upon which the Action II Plaintiffs rely, they all flow from Paragraph 90 of the Action II Complaint:

> Following the WBC's May 13, 2016 announcement that trace amounts of Meldonium had been found in Povetkin's April 27, 2016 sample, Defendants falsely asserted that the Bout was cancelled and made a barrage of defamatory statements to journalists and to the public regarding Povetkin, World of Boxing, and Ryabinskiy.  Specifically, Defendants accused Povetkin (1) of ingesting Meldonium after the substance was banned by WADA on January 1, 2016; (2) of ingesting Meldonium to gain an unfair advantage over Wilder during the Bout and previously in Povetkin's career; and (3) of placing Wilder's health and safety at risk by ingesting a banned substance.  In addition, Defendants accused Povetkin, World of Boxing, and Ryabinskiy of lying to VADA and the public in an effort to cover up what Defendants claimed was Povetkin's illicit attempt at cheating.

(Exhibit B to Burstein Dec., at ¶ 90)

As an initial matter, the 13 statements listed in the Complaint can be searched in vain for any statement by any Action II Defendant claiming that the Bout was unequivocally cancelled. In any event, even assuming *arguendo* that Action II Defendants made such a statement, Action II Plaintiffs make no effort to explain how an assertion that the Bout was cancelled, instead of merely postponed, constitutes defamation *per se*.  Therefore, Action II Plaintiffs' claim that they were defamed by Action II Defendants' supposedly false assertion that the Bout was cancelled must be rejected.

Next, there can be no doubt that Povetkin, Ryabinskiy, and WOB are at least limited purpose public figures for the purposes of the Bout.  As shown by Exhibit D to Burstein Dec., each of the Action II Plaintiffs have met all of the requirements set forth in *Lerman* to establish that they are at least limited purpose public figures.  Indeed, it is almost impossible to imagine that they would dispute this claim, given that they have inundated the media with their position

13

on the issues of why the Bout did not go forward and whether Povetkin improperly used Meldonium.  Accordingly, in order for their defamation claim to survive a motion to dismiss, the Action II Plaintiffs must plead facts permitting a plausible inference that the Action II Defendants made the statements at issue with actual malice.  *See Biro*, 963 F. Supp.2d at 279-80.

For reasons that follow, the supposed defamatory statements alleged in the Action II Complaint cannot support a defamation claim for one or more of the following reasons: (1) they are true; (2) they constitute non-actionable statements of opinion or rhetorical hyperbole; or (3) the Action II Complaint does not contain any plausible factual allegations that any of the complained-of statements were made with actual malice.

### 1.    DiBella's Alleged Statements

We now address each alleged statement by DiBella, listed in Paragraph 66(a)-(c) of the Action II Complaint, *seriatim*.

> **a)** "The information you [ESPN] have obtained [from Dr. Margaret Goodman] . . . contradicts the public statements made by Mr. Ryabinskiy attempting to excuse Povetkin's positive result.  If there was a trace amount from 2015 in his system, it would have shown up in the other three tests in April that precede the positive result."  Dan Rafael, *Two reports assert Alexander Povetkin took meldonium after ban*, ESPN.com (May 15, 2016), http://espn.go.com/boxing/story/_/id/15543234.[6]

As explained in the article, Dr. Goodman reported that Povetkin tested negative for Meldonium on April 7, April 8, and April 11, and then tested positive for the substance on April 27.  The statement at issue here is DiBella's opinion that three negative tests followed by a positive test contradicts Ryabinskiy's assertion that the positive test resulted from trace amounts of Meldonium in Povetkin's system left over from taking the substance before January 1, 2016.  DiBella's statement was plainly an opinion that is non-actionable because it was accompanied by

---

[6]    The article mentioned is annexed as Exhibit E to Burstein Dec.

a recitation of the facts upon which it was based.  Moreover, those recited facts – that Povetkin tested negative three times and then positive the fourth time – are undisputedly true.

**b)** "This is a very serious PED because it wasn't on the (World Anti-Doping Agency) banned list until Jan. 1.  This is the type of PED that results in extremely elevated stamina and a fighter performing like the Energizer bunny." Dan Rafael, *Two reports assert Alexander Povetkin took meldonium after ban*, ESPN.com (May 15, 2016), http://espn.go.com/boxing/story/_/id/15543234.

It is surprising that the Action II Plaintiffs contend that they have been defamed by this statement, as it is merely a comment on the effects of Meldonium, and does not say anything about them.  In any event, both parts of this statement – that Meldonium is a "very serious PED," and that it results in "extremely elevated stamina and a fighter performing like the Energizer bunny" – are clearly non-actionable statements of opinion or hyperbole.  The science of Meldonium aside, DiBella's belief that Meldonium is a dangerous performance-enhancing drug that results in increased stamina is supported by the facts contained in the Action II Complaint; namely that (1) Meldonium is banned by WADA, and (2) "hundreds of athletes" have tested positive for Meldonium since January 1, 2016.  (Exhibit B to Burstein Dec., at ¶¶ 38, 42) The fact that Meldonium is banned by WADA supports DiBella's statement that it is "dangerous," and the fact that "hundreds of athletes" have tested positive for it since January 2016 supports DiBella's assertion that it is a performance-enhancing drug, because that logically explains why at least "hundreds of athletes" have taken it.

Moreover, even if it were to turn out that Meldonium is *not* dangerous and is *not* a performance-enhancing drug, as must be the case for this statement to support a defamation claim, the Action II Plaintiffs still fail here because they have not alleged any facts giving rise to a plausible inference of malice.

**c)** "As a result of Povetkin's use of a banned substance and breach of contract, Deontay Wilder was deprived of an opportunity to defend his title as he was

15

prepared to on an even playing field." Zachary Alapi, *Deontay Wilder statement about Povetkin's positive test*, The Living Daylights (May 16, 2016), https://thelivingdaylights.co/2016/05/16/deontay-wilder-statement-about-povetkins-positive-test/.

This statement is unequivocally true, and therefore cannot be defamatory. Because Povetkin tested positive for Meldonium, the WBC would not permit the fight to go forward as scheduled, thereby depriving Wilder of the opportunity to defend his title. Moreover, given that Meldonium is a banned substance, and it was reported that Povetkin had tested positive for the drug, Wilder would not have been defending his title on "an even playing field."

We now address each alleged statement by Wilder, listed in Paragraph 67(a)-(j) of the Action II Complaint, *seriatim*.

    **a)** "This was a coward's way out. I have no respect for athletes who cheat their way to the top. I don't even see how you can live with yourself, knowing that you had to cheat to get what you got. How can you look yourself in the mirror?" William C. Rhoden, *Even Deontay Wilder, an Untainted Boxer, Loses Out in a Doping Scandal*, NYTimes.com (May 16, 2016), http://nyti.ms/1sktdrN.

This, too, is clearly a non-actionable statement of opinion or hyperbole. Moreover, it is based on the unequivocal, undisputed fact that Povetkin tested positive for Meldonium – a banned substance. And again, even assuming *arguendo* that Povetkin did not "cheat" by using a banned substance, the Action II Plaintiffs have failed to allege any facts giving rise to a plausible inference that Wilder made this statement with malice. Moreover, Wilder's characterization that Povetkin's positive test was "the coward's way out" is clearly, in the context of a highly publicized boxing match, non-actionable rhetorical hyperbole.

    **b)** "He was coming to fight me with a knife in his hands. I was going to fight him with my hands." William C. Rhoden, *Even Deontay Wilder, an Untainted Boxer, Loses Out in a Doping Scandal*, NYTimes.com (May 16, 2016), http://nyti.ms/1sktdrN.

The Action II Plaintiffs apparently contend that Wilder was speaking literally when he said that Povetkin was coming to the fight with a knife. No reasonable reader could take such a

16

statement literally.  It was made in the context of the cancellation of a highly anticipated boxing match, and Wilder was clearly speaking figuratively in reference to Povetkin's use of a banned substance.  As such, this statement is rhetorical hyperbole that cannot support a defamation claim.

> **c)** "This is already a put your life on the line type of sport.  This was like someone coming to a fight with a knife in their hands."  Tim Dahlberg, *Wilder on Povetkin doping:  Like coming to fight with a knife*, AP.com (May 17, 2016), http://apne.ws/29rXCPd.

This statement is non-actionable hyperbole for the same reasons stated above.  In addition, Wilder stated that Povetkin's use of Meldonium was "*like* someone coming to a fight with a knife," making it clear to any reader that he was using a simile, as opposed to speaking literally.  (Emphasis supplied)

> **d)** "I'm very disgusted.  If they had apologized and manned up, then I believe in second chances.  It's the fight business and people get nervous and I understand trying to do something spectacular for your country and he went to the depths of cheating.  But they didn't man up (and apologize).  As far as I'm concerned, there is no future for Deontay Wilder and Alexander Povetkin.  He already [chose] his fate and he chose the cowardly way."  Wil Esco, *Deontay Wilder frustrated by WBC, claims thousands of boxers are doping*, BadLeftHook.com (May 24, 2016), http://www.badlefthook.com/2016/5/24/11759548/deontay-wilder-frustrated-by-wbc-claims-thousands-of-boxers-are-doping.

It is not clear what portion of this statement the Action II Plaintiffs allege is a "provable statement of fact" that is capable of supporting a defamation claim.  *Brahms*, 33 F. Supp. 3d at 198.  To the extent that this claim is based upon Wilder's characterization of Povetkin as a "cheater," it fails because Wilder merely expressed a non-actionable opinion based upon the undisputed and disclosed fact that Povetkin tested positive for a banned substance.  Further, even if it ultimately emerges that Povetkin did not take Meldonium after 2015, Action II Plaintiffs offer no basis for inferring that Wilder made this statement with malice.

> **e)** "I think this is definitely not his first time.  Even when they banned it, (three) of his tests came back negative and that last test came back positive.  Needless to say

17

he was taking it in small doses at a time trying to sneak it in.  It's not right. What's the crazy part about it that they don't want to admit it, they don't want to man up to the truth.  They're still trying to cover it up and make excuses about it. That's not cool." *Wilder: This is Not Povetkin's First Time, Man Up and Admit Use!*, BoxingScene.com (May 17, 2016), http://www.boxingscene.com/wilder-this-not-povetkins-first-time-man-up-admit-use--104679.

Wilder's supposition that Povetkin was "taking it in small doses" trying to "sneak it in" is a non-actionable statement of opinion because Wilder then went on to explain the truthful basis for his opinion: the undisputed fact that Povetkin tested negative three times before he tested positive once.  Similarly, Wilder's statement that "this is definitely not his first time" is also a non-actionable statement of opinion because, in that same article in which he was quoted, he explained the rationale behind his statement:

I have a lot of friends that are in this sport.  I have a lot of friends that know about the human body.  One of the things when you take certain substances is the shape of the head.  You start seeing the shape of the head change.  From how his head was before to how it is now, it's shaped differently.  That made us assume that he had to be juicing or something.

Thus, Wilder's statement was not one that implied the existence of any undisclosed untrue facts.  Instead, Wilder fully explained the reasons for his opinion.  Furthermore, Action II Plaintiffs again offer no allegations which give rise to a plausible inference that Wilder made any of these statements with malice.

> **f)** Wilder's statement that "I have a lot of friends that are in this sport.  I have a lot of friends that know about the human body.  One of the things when you take certain substances is the shape of the head.  You start seeing the shape of the head change.  From how his head was before to how it is now, it's shaped differently." *Wilder: This is Not Povetkin's First Time, Man Up and Admit Use!*, BoxingScene.com (May 17, 2016), http://www.boxingscene.com/wilder-this-not-povetkins-first-time-man-up-admit-use--104679.

As discussed above, Wilder offered this statement to explain why he believed this was not the first time Povetkin had taken Meldonium.  Like the above statement, this was a non-actionable statement of opinion in which Wilder disclosed the basis for his opinion: his

observations and his belief in what his friends had told him.  Moreover, an increase in head size is a recognized side effect of some banned substances.  (*See* Exhibit F to Burstein Dec.)  Further, the Action II Plaintiffs' allegations do not permit the inference that this statement by Wilder was made with malice.

> **g)** "It would be understandable if he tore something or broke something.  But when it comes to somebody taking something, whether by mouth or in his veins by syringe, that's unacceptable.  There should be no tolerance.  They were well aware of what they were doing."  Dan Rafael, *Wilder: Povetkin 'should be suspended'*, ESPN.com (May 25, 2016), http://es.pn/1qKaowM.

It is not clear what portion of this statement the Action II Plaintiffs allege is defamatory because it is undisputed that Povetkin took Meldonium, and Wilder's thoughts about what the punishment for such conduct should be are clearly non-actionable statements of opinion. Similarly, Wilder's statement that the Action II Plaintiffs were "well aware of what they were doing" is non-actionable because it is true.  In order to take Meldonium, you have to do it deliberately.  Therefore, it is unlike a situation where an unintentional injury keeps a fighter out of a bout, which Wilder explained he would forgive.  As with all the other statements at issue, Plaintiffs offer no basis for an inference that these statements were made with malice.

> **h)** "I definitely think he should be suspended.  This will set the tone for the future of boxing.  There are probably a lot of users on the edge of their seat right now. They could be next.  We gonna see what the [WBC] decision is.  I support the WBC movement to have a clean program.  But just because Povetkin got caught, a lot of guys haven't got caught.  Boxing is already dangerous without taking anything."  Dan Rafael, *Wilder: Povetkin 'should be suspended'*, ESPN.com (May 25, 2016), http://es.pn/1qKaowM.

Again, it is not clear what portion of this statement the Action II Plaintiffs allege is defamatory because, again, it is undisputed that Povetkin took Meldonium, and Wilder's thoughts about the effect on the wider boxing community of Povetkin getting caught are clearly non-actionable statements of opinion.  The Action II Plaintiffs also allege that Wilder's statement

19

was false in that it was a claim that that Povetkin's use of Meldonium would put Wilder's health and safety at risk.  (Exhibit B to Burstein Dec., at ¶ 90)  This is a ludicrous contention because no one can rationally dispute the fact that boxing is a dangerous sport, and that giving one fighter an unfair advantage would increase the danger faced by his opponent. Moreover, Action II Plaintiffs offer no factual allegations allowing for an inference that this statement was made with malice.

> **i)**  "But because of his decision to use a banned substance, the fight didn't happen." Dan Rafael, *Deontay Wilder to make title defense against Chris Arreloa*, ESPN.com (June 14, 2016), http://espn.go.com/boxing/story/_/id/16191529.

This statement is non-actionable because it was completely true.  As demonstrated in POINT I, *supra*, the WBC did not permit the Bout to go forward because Povetkin tested positive for Meldonium.

> **j)**  "Why would he feel like, in this situation, that he would get a pass?  Just certain things that we've got the evidence to prove it.  Some guys like to fight on even playing grounds and some guys like to cheat."  Drew Champlin, *After being on 'verge of depression', Deontay Wilder ready for next heavyweight title fight in Birmingham*, AL.com (June 15, 2016), http://www.al.com/sports/index.ssf/2016/06/after_being_on_verge_of_depres.html.

For all the reasons stated *supra*, these statements are clearly non-actionable statements of opinion based on Povetkin's positive test.  The Action II Complaint is also bereft of any factual allegations that could support a claim that Wilder made this statement with malice.

<u>**POINT III**</u>

**THE ACTION II PLAINTIFFS' CLAIMS SHOULD BE DISMISSED BECAUSE THEY MUST BE BROUGHT, IF AT ALL, AS COMPULSORY COUNTERCLAIMS IN ACTION I**

Federal Rule of Civil Procedure 13(a) governs compulsory counterclaims.  It "'was designed to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters.'"  *Bonadio v. East Park Res., Inc.*, 220 F.R.D. 187, 189

(N.D.N.Y. 2003) (quoting *Southern Const. Co. v. Pickard*, 371 U.S. 57, 60 (1962)).  "If a party has a compulsory counterclaim and fails to plead it, the claim cannot be raised in a subsequent lawsuit."  *Bonadio*, 220 F.R.D. at 189 (quoting *Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir. 2000)).  In relevant part, the Rule provides as follows:

> **(1)** **In General**.  A pleading must state as a counterclaim any claim that -- at the time of its service -- the pleader has against an opposing party if the claim:
>
> > **(A)** arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
> >
> > **(B)** does not require adding another party over whom the court cannot acquire jurisdiction.

For the reasons stated *supra*, at pp. 3-4, Action II is a mirror image of Action I – with the exception that the Action II Plaintiffs' Third Claim for Relief is for defamation.  However, Action II Plaintiffs' defamation claims in the Action II Complaint arise out of the same "transaction or occurrence" as the claims in the Action I Complaint – breach of the WBC and Escrow Agreements – and therefore come within the ambit of Rule 13(a)(1)(A).  *See Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1251 (9th Cir. 1987) ("As long as the allegedly defamatory statements are sufficiently related to subject matter of the original action, they may be barred as compulsory counterclaims."); *Appletree v. City of Hartford*, 555 F. Supp. 224, 229-30 (D. Conn. 1983) (Rule 13(a)(1)(A) applies where "a counterclaim is based on a libelous publication contemporaneous with the transaction complained of in the original dispute….").

The only other difference between Action I and Action II is that, in Action II, the presidents of the corporate parties – Ryabinskiy and DiBella – have been added as parties.  This is a distinction without a difference.

With respect to Dibella, the Second Circuit "has interpreted the term 'opposing party' [in Rule 13(a)] to encompass entities that are 'one and the same for purposes of . . . litigation.'" *Neilson Co. (U.S.), LLC v. Success Systems, Inc.*, 112 F. Supp. 3d 83, 118 (S.D.N.Y. 2015) (quoting *Banco Nacional de Cuba v. First Nat'l City Bank of N.Y.*, 478 F.2d 191, 193 (2d Cir. 1973)). Here, the Action II Complaint concedes that DiBella – the president of DBE – is functionally one and the same with DBE by alleging that every allegedly defamatory statement made by DBE was made "through its principal Lou DiBella...." (Exhibit B to Burstein Dec., at ¶ 66) Accordingly, the claims that Povetkin and WOB – the Action I Defendants – have brought against DiBella in Action II are barred and, if not dismissed with prejudice, must be pled as counterclaims in Action I.

Ryabinskiy's claim in the Action II Complaint is also a compulsory counterclaim in Action I because, as the President of WOB, he controls WOB's defense in Action I. *See Avemco Ins. Co. v. Cessna Airt Co.*, 11 F.3d 998, 1001 (10th Cir. 1993) ("In a situation such as this, where the insurer has controlled the defense in both actions, there is little to commend allowing the insurer to sit idly by during the subsequent litigation, only to bring a separate action against the very same defendant at a later date.").

## CONCLUSION

For the foregoing reasons, the Action II Defendants respectfully request that this Court enter an Order dismissing the Action II Complaint in its entirety with prejudice or, in the alternative, dismissing it without prejudice so that Action II Plaintiffs may file their claims in the Action II Complaint as counterclaims in Action I.

Dated: New York, New York
      July 25, 2016

                    Respectfully submitted,

                    JUDD BURSTEIN, P.C.

                    By_____
                    Judd Burstein (JB-9585)
                    5 Columbus Circle, Suite 1501
                    New York, New York 10019
                    Tel.: (212) 974-2400
                    Fax: (212) 974-2944
                    Email: jburstein@burlaw.com
                    *Attorneys for Action II Defendants*

23